

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD86735** |
| | ) | |
| **v.** | ) | **OPINION FILED:** |
| | ) | **JULY 1, 2025** |
| **ROSENDO PALMA,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable S. Margene Burnett, Judge

Before Division Two:  Cynthia L. Martin, Presiding Judge, Gary D. Witt, Judge and W. Douglas Thomson, Judge

Rosendo Palma ("Palma") appeals from the trial court's judgment convicting him of one count of attempted statutory rape in the first degree in violation of section 566.032,[1] one count of statutory sodomy in the first degree in violation of section 566.062, and one count of attempted statutory sodomy in the first degree in violation of section 566.062.  Palma asserts that the trial court plainly erred in failing to instruct the jury that, when evaluating Palma's guilt, it should only consider the court interpreter's official translation of evidence from Spanish to English and disregard its own knowledge

---

[1]All statutory references are to RSMo 2016, as supplemented through the dates of Palma's offenses unless otherwise indicated.

of Spanish. Palma also challenges the trial court's exclusion of a social media post, arguing that the post was admissible to impeach a witness's credibility. Finding no error, we affirm.

## Factual and Procedural Background

Palma does not challenge the sufficiency of the evidence to support his convictions. Viewed in the light most favorable to the verdict, the following evidence was adduced at trial.[2]

H.G. ("Mother") and S.G. ("Victim") immigrated to the United States from Guatemala in 2017, and have lived in Kansas City, Missouri since their arrival in the country. Mother met Palma shortly after arriving in Kansas City. Palma is married to Mother's cousin J.L. ("Cousin"). Cousin babysat Victim at the home she shared with Palma while Mother worked. Palma was almost always present when Mother picked Victim up at the end of the day. Mother would occasionally find Victim and Palma in a bedroom with the door closed. According to Mother, Palma and Victim would be on the bed and underneath the covers, while Victim watched television or played with Palma's phone. Mother thought such circumstances were normal because she never imagined Palma hurting Victim.

On May 25, 2021, Mother picked Victim up from Cousin's home after work. After returning home, Victim told Mother that "her part where she pees from was burning." Mother looked at Victim's genitals and noticed redness that appeared to be a

___

[2]When reviewing a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *State v. Warren*, 702 S.W.3d 48, 50 n.2 (Mo. App. W.D. 2024).

2

rash, so she asked Victim what happened. Victim told Mother that Palma had touched her "pucha" with his fingers and began crying. Mother explained during her trial testimony that "pucha" is the word they used for vagina.

Mother took Victim to Children's Mercy Hospital, where Victim was examined by a sexual assault nurse examiner. The examination revealed no injuries and did not detect the presence of male DNA. A physician specializing in child abuse explained that the absence of injury was not unusual because female genital tissue is stretchy and heals quickly. Children's Mercy personnel notified the police of Victim's report that Palma touched her genitals with his fingers.

Victim was interviewed at the Child Protection Center ("CPC") by T.A., a forensic interviewer ("CPC Interviewer"), on June 7, 2021. Because Victim speaks Spanish, an interpreter was present during the interview to translate the CPC Interviewer's questions into Spanish and the Victim's answers into English. Victim told the CPC Interviewer that she would go upstairs with Palma, who Victim referred to as "Chindo," at the home he shared with Cousin. Victim explained that, while they were upstairs, Palma would touch her "pucha" "very hard" with his hands on both the inside and the outside of her body. Victim also told the CPC Interviewer that Palma removed his pants and went "on top" of her. When the CPC Interviewer gave Victim anatomically correct dolls and asked Victim to show what happened, Victim used the dolls to pantomime the male doll thrusting on top of the female doll. Victim told the CPC Interviewer that Palma's penis touched the inside of her "pucha." Victim described an instance in which Palma told her to put her mouth on his penis, but she refused. But, later during the interview, Victim recalled a

3

time when Palma made her put her mouth on his penis while he watched videos on his phone. Victim informed the CPC Interviewer that she was four years old when each of the instances occurred.

A grand jury indicted Palma on three charges: (1) statutory rape in the first degree "in that between June 11, 2020, and May 25, 2021, . . . [Palma] knowingly had sexual intercourse with [Victim], a child less than twelve years old" ("Count I"); (2) statutory sodomy in the first degree "in that between June 11, 2020, and May 25, 2021, . . . [Palma] for the purpose of arousing or gratifying the sexual desire of [Palma] knowingly had deviate sexual intercourse with [Victim], who was then a child less than twelve years old, by touching her vagina with his hand" ("Count II"); and (3) statutory sodomy in the first degree "in that between June 11, 2020, and May 25, 2021, . . . [Palma] for the purpose of arousing or gratifying the sexual desire of [Palma] knowingly had deviate sexual intercourse with [Victim], who was then a child less than twelve years old, by placing his penis in her mouth" ("Count III").

Palma's jury trial was initially set to begin on July 24, 2023, but upon completing voir dire, a jury of twelve jurors and two alternates could not be seated. The case was continued until July 31, 2023. A jury was seated from the second venire panel, and the presentation of evidence began the next day. The State's evidence included testimony from Mother and Victim, both of whom testified in Spanish. An official court interpreter translated Mother's and Victim's testimony to English. The CPC Interviewer also testified, and a video of Victim's interview was entered into evidence and played for the jury. The video of the interview included both Victim's statements and the interpreter's

4

translation of the Victim's statements into English. Palma elected to testify during the trial, and his testimony was translated by an official court interpreter from Spanish to English.

At the conclusion of the evidence, the trial court noted on the record that the trial court had been informed by a judicial administrative assistant who speaks Spanish that she believed she heard Palma testify about Victim engaging in sexual acts with a pillow. The official court interpreter denied that Palma gave such testimony and clarified that Palma's testimony concerned Mother's boyfriends, a topic that the trial court had ruled was inadmissible. The official court interpreter stopped translating when told to do so by defense counsel, so Palma's testimony regarding Mother's boyfriends was not translated into English. The trial court determined that the best course of action would be to first determine whether any of the jurors spoke Spanish, and if any raised their hands, to instruct the jury that it should only consider evidence that was translated into English.

Before the trial court read the jury instructions, the trial court first asked the jury whether anyone speaks Spanish. Two jurors raised their hands. The trial court then instructed the jury as follows:

> I want to remind you or say--and I didn't say this to begin with--when someone is speaking another language and we have an interpreter, sometimes there is an objection made or there's a stop. If it has not been translated by the interpreter, it's not to be considered. So in case you heard something when someone kept talking and it didn't get translated, put that out of your mind.

The trial court then had a bench conference and asked defense counsel whether he would prefer for the trial court to speak privately with the two jurors who indicated they speak

5

Spanish.  Defense counsel declined and informed the trial court that the defense "[is] not asking for anything further."

The jury found Palma guilty as follows: (1) with respect to Count I, guilty of attempt to commit statutory rape in the first degree; (2) with respect to Count II, guilty of statutory sodomy in the first degree; and (3) with respect to Count III, guilty of attempt to commit statutory sodomy in the first degree.  The jury recommended that Palma be sentenced to ten years' imprisonment for Count I, to fifteen years' imprisonment for Count II, and to ten years' imprisonment for Count III.  The trial court held a sentencing hearing on November 17, 2023, and entered a judgment of conviction and sentence ("Judgment").  The Judgment reflected the jury's verdicts, sentenced Palma as the jury recommended, and ordered the sentences to run consecutively.

Palma appeals.  Additional facts will be addressed as relevant to the discussion of Palma's points on appeal.

## Analysis

Palma presents three points on appeal.  Palma's first point on appeal asserts that the trial court committed plain error in failing to generally instruct the jury prior to the admission of any evidence that it should only consider testimony translated by the official court interpreter and should not consider any testimony that was not translated from Spanish to English ("Point One").  Palma's second point on appeal argues that the trial court's instruction to the jury after the close of the evidence limiting consideration of testimony to that which was translated from Spanish to English was plain error because it only addressed testimony that had been subject to an objection ("Point Two").  Palma's

6

third point on appeal contends that the trial court abused its discretion in refusing to allow the defense to cross-examine the CPC Interviewer about her online statement that child abuse should equal the death penalty ("Point Three").

### Points One and Two: Instructional Error

Points One and Two are closely related, and will be addressed together. Palma's first point on appeal claims it was plain error for the trial court to fail to *sua sponte* read an instruction to the jury prior to the admission of evidence limiting its consideration of testimony to that translated by the official court interpreter from Spanish to English. Palma's second point on appeal claims that the instruction given to the jury after the close of the evidence limiting consideration of testimony to that which had been translated was plain error because it only addressed testimony that had been subject to an objection.[3]

Rule 30.20[4] describes the framework for plain error review as follows: "Whether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has

---

[3]Palma acknowledges that he did not preserve Points One and Two for appeal and requests plain error review. There is authority for affording plain error review to the failure to give MAI instructions even when a defendant fails to object to an instruction and affirmatively states it has no objection, if manifest injustice would otherwise occur." *State v. Irby*, 693 S.W.3d 204, 207 (Mo. App. S.D. 2024) (citing *State v. Wurtzberger*, 40 S.W.3d 893, 898 (Mo. banc 2001)). However, we are aware of no authority for affording plain error review to a trial court's failure to anticipate the need for and give unrequested non-MAI instructions. Even were we to grant plain error review here, we would not find evident, obvious and clear error, or manifest injustice warranting relief, for the reasons we explain.

[4]All Rule references are to *Missouri Court Rules, Volume I--State, 2025* unless otherwise noted.

7

resulted therefrom."  Plain error review is a two-step process.  *State v. Love*, 700 S.W.3d 288, 292 (Mo. App. W.D. 2024).  We must first determine whether the trial court committed error affecting a substantial right that is "evident, obvious, and clear."  *State v. Royal*, 703 S.W.3d 650, 665 (Mo. App. W.D. 2024).  The second step requires us to determine "whether the claimed error resulted in manifest injustice or a miscarriage of justice."  *Love*, 700 S.W.3d at 293 (quoting *State v. Mills*, 687 S.W.3d 668, 675 (Mo. banc 2024)).  As applied to alleged instructional error, plain error review requires the defendant to "show more than mere prejudice and [instead demonstrate] that the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict."  *State v. Denham*, 686 S.W.3d 357, 368 (Mo. App. W.D. 2024) (quoting *State v. Gannan*, 658 S.W.3d 103, 111-12 (Mo. App. W.D. 2022)).

Missouri courts are required to "appoint qualified interpreters and translators in all legal proceedings in which the non-English speaking person is a party or a witness."  Section 476.803.1; *see also* Supreme Court Operating Rule 19.04.  The interpreter must "take an oath that he or she will make a true interpretation to the party or witness in a language that the party or witness understands and that he or she will make a true interpretation of the party or witness' answers to questions to counsel, court, or jury, in the English language, with his or her best skill and judgment."  Section 476.803.5; *see also* Supreme Court Operating Rule 19.04(d).

The Missouri Approved Instructions-Criminal ("MAI-CR") do not include a pattern instruction addressing interpreted testimony.  Even though there is no applicable

8

pattern instruction, Palma argues that the trial court should have *sua sponte* given an instruction before evidence was presented admonishing the jury to rely solely on evidence translated from Spanish to English and to not rely on any evidence that was not translated, but that had been heard and understood based on a juror's personal knowledge of Spanish. Palma argues that in the absence of such an instruction, his rights to due process, a fair trial, and a trial by jury with a unanimous verdict derived from the same evidence were violated.

Palma acknowledges that there is no Missouri authority requiring a jury instruction addressing an official court interpreter's translation of the evidence. In the absence of any authority mandating an instruction regarding the translation of evidence into English, we cannot find that the trial court's failure to *sua sponte* give such an instruction prior to the admission of evidence constituted evident, obvious, and clear error.[5] "Rule 28.02(c) mandates the exclusive use of the Missouri Approved Instructions-Criminal whenever there is an instruction applicable under the law." *State v. Clay*, 533 S.W.3d 710, 715-16 (Mo. banc 2017) (quoting *State v. Davis*, 203 S.W.3d 796, 798 (Mo. App. W.D. 2006)). Though Rule 28.02(d) contemplates that non-MAI instructions can be requested and used if there is no "applicable" MAI, it defies logic to suggest that a trial court is *sua sponte* obligated to forecast the need to craft or submit non-MAI instructions.

---

[5]Palma does cite to pattern jury instructions in twenty-three states and six federal circuits to support his contention that the trial court's failure to instruct the jury about the translation of evidence constituted plain error. This persuasive authority does not establish that the trial court's failure to *sua sponte* give such an instruction constituted evident, obvious, and clear error.

9

Undeterred, Palma argues that the trial court should have been aware of the need to instruct the jury prior to the admission of evidence about translated testimony because of the unsuccessful attempt to seat a jury on his original trial date. On that occasion, during voir dire, three potential jurors indicated that they speak Spanish conversationally, and that they would have difficultly setting aside their own interpretation of the Spanish testimony in favor of the English translation.[6]

Palma's contention is disingenuous. Despite the response received from three potential jurors on his first scheduled trial date, Palma's attorney did not ask during voir dire on his second trial date whether any of the potential jurors spoke Spanish. Instead, Palma's attorney asked questions about the translators who would be interpreting evidence from Spanish to English, including whether any of the potential jurors believed that the interpreters favored the defense; whether any of the potential jurors thought that Palma should be speaking English; and whether any of the potential jurors thought the witnesses should be speaking English. Nobody answered affirmatively. A jury was ultimately sworn with no indication in the record at that time that any of the seated jurors were Spanish speaking. If Palma's counsel did not see any need under the circumstances

_____

[6]Palma's brief asserts that the trial court recognized that Spanish jurors' inability to set aside their own interpretation of Spanish statements posed a conundrum because the trial court stated during his first voir dire: "I have not had that happen. There is always a first time. I don't know. We'll deal with it whenever it happens." [Appellant's Brief, p. 27] Palma's brief misrepresents the context in which the trial court made this statement.

One of the potential jurors during the first attempt to seat a jury asked whether, if he misheard the Spanish testimony or the interpretation of it, could he ask for the witness to repeat the answer and the certified court interpreter to reinterpret the testimony. The trial court made the above statement in response.

10

to request a non-MAI instruction that would admonish the jury to limit its consideration of evidence to that expressly translated from Spanish to English, we cannot fault the trial court for failing to *sua sponte* craft and submit an instruction to that effect prior to the admission of evidence.

When the trial court did become aware at the conclusion of the evidence of a *specific* potential concern that untranslated testimony had been provided by Palma after an objection was made, it did *sua sponte* act to address the concern. The trial court advised the parties that a Spanish-speaking judicial administrative assistant believed she heard Palma make a statement about Victim engaging in sexual acts with a pillow. This statement was not interpreted because Palma's counsel had directed the official court interpreter to stop interpreting after an objection was made. The trial court stated it was "worried," and that the jurors might need to be asked if they heard anything. Both counsel acknowledged that neither knew if any of the persons seated for the jury spoke Spanish. The trial court stated that it would ask the jurors the next day whether any of the jurors speaks Spanish, and then would remind them to limit what they consider to the testimony that was translated. Neither party expressed any objection to this plan. When questioning the next day identified two jurors who spoke Spanish, the trial court generally instructed that "[i]f it has not been translated by the interpreter, it's not to be considered." Though the trial court prefaced this instruction by noting that sometimes "there is an objection made or there's a stop" after which a witness might keep speaking, we cannot say that the instruction, read as a whole, evidently, obviously, or clearly

11

limited the scope of the admonition therein contained to non-translated testimony given after an objection.

We do not find, therefore, plain error. Even had we, however, we would not find that Palma established a manifest injustice or a miscarriage of justice. Palma has not demonstrated how the trial court's failure to instruct the jury about translated testimony prior to the admission of evidence affected the jury's verdict. *Denham*, 686 S.W.3d at 368. Palma broadly claims that, because the jury was not directed by the trial court to limit its consideration of evidence to the English translation provided by the official court interpreter, the jury's verdicts were not unanimous. Palma argues that, by not being instructed to limit their consideration of the evidence to the English translation provided, the two jurors who indicated they spoke Spanish "were free to reach a verdict on evidence different from the evidence considered by other jurors," a "fundamentally unfair" deprivation of "[Palma's] rights to due process, a fair trial, and trial by jury with a unanimous verdict derived from the same evidence." [Appellant's Brief, p. 31] Palma also asserts that, without an instruction limiting the jury's consideration of evidence to English translation thereof, the Spanish-speaking jurors "were free to communicate their own interpretation to the other jurors in deliberation," thereby risking that the jury would reach verdicts based on evidence not presented in English and impeding the right to meaningful appellate review. [Appellant's Brief, pp. 34-35]

Palma's hypothetical concerns are not self-proving. The only specific example of testimony identified by Palma as susceptible to misinterpretation is Mother's testimony that Victim used the word "pucha" to describe her vagina. Palma claims that the official

12

court interpreter was not able to provide a translation for "pucha," and that, as a result, the Spanish-speaking jurors "could have interpreted the word differently than the other jurors." [Appellant's Brief, p. 32] This claim, however, is not supported by any reference to the transcript, and is purely speculative. A defendant's claim of prejudice cannot be based on mere speculation and instead must be based on proof in the record. *State v. Taylor*, 134 S.W.3d 21, 25 (Mo. banc 2004).

The trial court did not commit plain error in failing to *sua sponte* instruct the jury prior to the admission of evidence about its consideration of testimony being limited to that translated by the official court interpreter, or in referencing testimony offered after an objection in so instructing the jury after the close of the evidence.

Points One and Two are denied.

### Point Three: Exclusion of Evidence

In his third point on appeal, Palma argues that the trial court abused its discretion in refusing to allow Palma to ask the CPC Interviewer about "whether [she] made, agreed, or agrees with the statement that child abuse should equal the death penalty." [Appellant's Brief, p. 52] Palma asserts that such a question concerned both the CPC Interviewer's credibility, and the CPC Interviewer's potential bias and prejudice against Palma, because he had been accused of child abuse. Palma argues that, because the State relied heavily on the video of the CPC Interviewer's interview with Victim in his closing argument and because the jury asked for the video recording of the interview during its deliberations, Palma suffered prejudice because he was unable to challenge key sources of evidence on which the State heavily relied at trial.

13

Because trial courts are vested with broad discretion to admit or exclude evidence, alleged error relating to the admission or exclusion of evidence is reviewed for an abuse of discretion. *State v. Karim*, 685 S.W.3d 658, 662 (Mo. App. W.D. 2024). A trial court has "broad discretion to limit the scope of cross-examination." *State v. Lawson*, 693 S.W.3d 82, 107 (Mo. App. E.D. 2023) (quoting *State v. Raines*, 118 S.W.3d 205, 213 (Mo. App. W.D. 2003)). "A trial court abuses its discretion when its decision is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Fisher*, 705 S.W.3d 664, 680 (Mo. App. W.D. 2024) (quoting *Denham*, 686 S.W.3d at 371). "[I]f reasonable [persons] can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Lawson*, 693 S.W.3d at 107 (quoting *State v. Perkins*, 656 S.W.3d 285, 295 (Mo. App. E.D. 2022)). We will only reverse the trial court's judgment on the basis of an evidentiary ruling if the exclusion of evidence "was so prejudicial that it deprived the defendant of a fair trial." *Fisher*, 705 S.W.3d at 680-81 (quoting *Denham*, 686 S.W.3d at 371). "The erroneous exclusion of evidence in a criminal case creates a presumption of prejudice that the State may rebut by proving that the error was harmless beyond a reasonable doubt." *Lawson*, 693 S.W.3d at 107.

Prior to trial, the State filed a motion in limine in which it asked the trial court to exclude evidence of "bad acts, immorality, or arrests" of State witnesses, and in that motion in limine, specifically asked the trial court to prohibit Palma from introducing "decade[-]old 'tweets' that [the CPC Interviewer] either liked or 'retweeted,'" arguing that

14

those "tweets are wholly irrelevant to her testimony in this case." The trial court sustained the motion.

Near the end of the cross-examination of the CPC Interviewer, Palma's attorney asked the CPC Interviewer whether she "made a statement or . . . agreed with the statement that child abuse . . . should equal the death penalty." The State immediately asked for a bench conference, and the following exchange occurred:

> State's attorney: That's a blatant violation of the motion in limine [ruling]. It's a reference to some Twitter comments that the witness made ten years ago. The court has already ruled that it's inadmissible. It was clearly made in violation of that. The State would ask that question be stricken.
>
> Palma's attorney: I don't know that there ever was a motion in limine on that point.
>
> State's attorney: When I filed my motion in limine--
>
> . . . .
>
> Trial court: And your--what was your specific motion in limine? What was the--
>
> States' attorney: It was--I'd have to look at it. But, it was essentially prior bad acts or immorality of witnesses. And, I specifically put that I suspected that he would try to introduce or discuss decade-old tweets from [the CPC Interviewer], and they should be inadmissible. That's a blatant violation to that. It would have been in the motion in limine that I filed which was--
>
> . . . .
>
> State's attorney: It would have been number 7.
>
> Trial court: Bad acts, immorality, or arrest of state witnesses. . . .
>
> Palma's attorney: I do have something to add to that. . . . So bad acts or immorality has more to do with uncharged bad acts, not the credibility of a witness or interest or bias. And the court already--when we were talking about the immigration, which obviously has nothing to do with this witness--indicated that bias or interest of a witness is something that is admissible. And if she's saying she's a neutral party then . . . basically [the

15

CPC Interviewer has] already concluded that something--a particular outcome should happen. I think that's bias or interest that goes to the credibility of the witness.

Trial court: All right. And my ruling at the motion in limine because it was specifically directed to her old tweets and I am going to overrule the objection--or sustain the objection and direct that the jury disregard the question.

The proceedings returned to open court, and the trial court directed the jury "to disregard the last question that was just asked." Palma asserted in his motion for new trial that the trial court erred in preventing his attorney from asking the CPC Interviewer "about a tweet or retweet from her Twitter account in which the writer opines that people who abuse children deserve the death penalty."[7]

Evidence is admissible if it is both logically and legally relevant. *Fisher*, 705 S.W.3d at 681. "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* (quoting *State v. Prince*, 534 S.W.3d 813, 817 (Mo. banc 2017)). "A witness's credibility and bias in relation to a party are logically

---

[7]The State argues that our review of Palma's third point on appeal is limited to plain error because Palma did not make an offer of proof regarding the excluded cross-examination of the CPC Interviewer. Palma acknowledges he did not make an offer of proof, but argues that doing so was unnecessary because the record demonstrates that the trial court and opposing counsel were sufficiently advised as to what the testimony of the witness would probably be, and the appellate court can determine from the record whether the excluded testimony was proper evidence. Under the circumstances in this case, we believe the record is sufficiently clear to have permitted the trial court and this court to understand what the excluded testimony would have been. "[A] party may be excused from the requirement of an offer of proof when there is a complete understanding from the record what the excluded testimony would have been, the objection relates to a category of evidence rather than specific testimony, and the record shows the evidence would have helped its proponent." *State v. Tetmeyer*, 699 S.W.3d 886, 889 (Mo. App. S.D. 2024) (quoting *State v. Rieser*, 569 S.W.3d 452, 455 (Mo. App. E.D. 2018)).

16

relevant." *Lawson*, 693 S.W.3d at 107.  Nevertheless, the trial court may "limit inquiry into bias and credibility in relation to its legal relevance." *Id.*  Legal relevance requires "weigh[ing] the probative value of the evidence against its costs--unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Fisher*, 705 S.W.3d at 681 (quoting *Prince*, S.W.3d at 818).  In weighing the probative value of evidence against its costs, "the trial court retains 'wide latitude . . . to impose reasonable limits on . . . cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" *Lawson*, 693 S.W.3d at 108 (quoting *Raines*, 118 S.W.3d at 213-14).

Whether the CPC Interviewer harbored bias or prejudice against Palma, and the CPC Interviewer's credibility as a witness, were logically relevant areas of inquiry. However, the trial court had wide latitude to limit inquiry into a decade-old online statement that the CPC Interviewer either made or liked from her Twitter account on the basis of legal relevance.  Palma argues that the trial court's decision to exclude cross-examination about the CPC Interviewer's decade-old online statement was both against the logic of the circumstances and was so unreasonable and arbitrary so as to shock the sense of justice and indicate a lack of careful consideration because the evidence suggests the CPC Interviewer might have been motivated to exaggerate her testimony. We disagree.

The CPC Interviewer's direct examination was limited in scope.  She explained her role as a forensic interviewer of children generally, confirmed that she conducted an

17

interview of Victim on June 7, 2021, and identified the video recording of the interview. Then, the video recording was played for the jury. The CPC Interviewer's direct examination ended by identifying the anatomically correct drawings that were used during the interview of Victim, and those drawings were entered into evidence. At that point, Palma's attorney cross-examined the CPC Interviewer and highlighted the following: (1) that the CPC Interviewer does not hold a professional license, and is not a social worker, phycologist, or a therapist; (2) that the CPC Interviewer is employed by the Child Advocacy Center, which is a part of multidisciplinary team that includes law enforcement, the prosecutor's office, and the Children's Division of the Missouri Department of Social Services that works to investigate allegations of child abuse and sexual abuse; (3) that the CPC Interviewer's job is to attempt to elicit information from a child that investigators may want for their investigation of alleged crimes; and (4) the discrepancies between the video recording of Victim's interview and the CPC Interviewer's written report. Taken together, Palma's cross-examination suggested to the jury that the CPC Interviewer was unqualified, harbored a bias toward the State due to her participation on a multidisciplinary team responsible for investigating child abuse and sexual abuse, and failed to make an accurate written record of her interview of Victim.

Given these circumstances, we cannot conclude that the trial court's exclusion of evidence about a decade-old online statement that the CPC Interviewer either made or liked from her Twitter account was against the logic of the circumstances or was so arbitrary so as to shock our sense of justice and indicate a lack of careful consideration. The CPC Interviewer's online statement was temporally remote, was not specifically

18

targeted at Palma, and was cumulative of other evidence of the CPC's Interviewer's bias and prejudice that was directly related to the prosecution of Palma.

Point Three is denied.

## Conclusion

The Judgment is affirmed.

_Cynthia L. Martin_

Cynthia L. Martin, Presiding Judge

All concur

19